United States Court of Appeals for the Ninth Circuit is now in session. Yes, welcome everyone to the Ninth Circuit remotely. My colleagues, Judges Miller and Hawkins welcome you as well. We have it designated as 20 minutes each side. And if you're the appellant, that is your total time if you wish to reserve any time for rebuttal. That being said, I want to make sure that my colleagues have an opportunity to ask you all the questions that they want to ask you. And so if your time is up, and the court's still asking you questions, you don't need to ask permission to continue. Just continue answering questions as long as judges are asking you questions. Otherwise, expect to be left to your time. So we're ready to hear from the appellant. Thank you, Your Honor. Good afternoon, may it please the court, Drew Ensign, Deputy Assistant Attorney General for the United States. I would like to reserve four minutes for rebuttal. All right, we'll keep that aspirationally in mind. I'm somewhat looking at the clock. So I'll try to help you if that's the case. Thank you, Your Honor. As the Supreme Court has already implicitly recognized by an exceptionally lopsided vote in the Venezuela TPS case, the government is likely to prevail in this TPS appeal here too, and it stays likewise warranted. Indeed, the Supreme Court's decision in Boyle makes clear that a state decision should control in like cases. And plaintiff's arguments here are weaker than in the Venezuela case on every conceivable level. So I think one thing that I don't think has been addressed yet, but you put it in there. What is the magic number about August 19th, 2025? And that's why we, because the alleged harm to the government that supports its request for emergency appellate brief, why do you need relief by today? Your Honor, that might have implied a precision that doesn't quite attach. They were already suffering irreparable harm in that one of the terminations would have taken effect on August 6th. And so the stay is already causing that harm. In addition, the two other terminations would have taken effect, I believe, on September 6th. So we, recognizing that our August 6th had already come and gone, we picked a date that would have expedited briefing, but nonetheless permit, you know, some sensibility to it. It didn't need to be, you know, overnight briefing and hearing. So there's nothing magical about August 19th. We've already begun to suffer irreparable harm because a decision would otherwise gone into effect that is stayed by the district court's order. But that's the rationale for the August 19th. Oh, I'm sorry. Go ahead, Judge Miller. So with respect to Guatemala and Honduras, those don't take effect until September, right? That's correct, Your Honor. So on those, you're not really suffering any harm today, are you? Uh, that's correct, Your Honor, in that it hasn't, those harms won't occur for another two weeks or so. And so Nepal is the one that would have been August 5th or 6th, I guess? I believe it's a 6th, Your Honor, but that may be plus or minus a day. And so what, in sort of practical, concrete terms, like what's not happening today that you would like to be happening today? Your Honor, you know, otherwise this would have taken effect and this would have permitted the government to take a variety of enforcement actions given the suspension of temporary status. I think the key to really analyzing these harms is that the irreparable harms here are effectively identical to NTPSA. NTPSA 1, which went before the Supreme Court, is the government's inability to carry out the programs that it has determined are warranted. Just as in the Venezuela case, the Supreme Court necessarily held that we would suffer irreparable, or likely to suffer irreparable harm when it granted its stay by a need to one margin. And we think the same results is controlling, or that same rationale is controlling here. So is it the government's opinion that there is any aspect of the Secretary's termination of TPS that is judicially reviewable? We don't believe so, Your Honor. It's certainly an extremely broad bar. It's, you know, I think the language that Congress selected here is important. It's there is no judicial review of any determination of the Secretary with respect to the designation or termination or extension of the designation dot dot dot. That has two features that make that prohibition exceptionally broad. It employs the adjective any to modify determination, and it also applies to not just determinations themselves, but anything with respect to a designation or termination or extension, and not merely such terminations or extension decisions themselves. And so that language renders this case strikingly similar to Patel versus Garland, which held that a statute barring, quote, any review of, quote, any judgment regarding the granting of relief, end quote, covered, quote, any authoritative decision on the matter, end quote. And so we think that same rationale is controlling here, and the same results should obtain here. So suppose, so just as an example, I guess it's subsection B3b says that when the Secretary terminates a designation, she has to give at least 60 days notice before the termination becomes effective. Suppose that the Secretary terminated a designation and announced this will become effective in 30 days. Do you think a court would be able to say, like, no, the statute says it has to be 60? I don't believe so, Your Honor, for at least two reasons. The first of which is that I think that would fall within the jurisdictional bar because it's a decision with respect to the determination. Without a termination determination, without a termination determination, you would have no reason to decide what the wind-down period should be. And so it absolutely is a decision with respect to it. I think it also is necessarily committed to agency discretion, and hence not reviewable under the APA, because of two features of the statutory language. So it is committed to agency discretion to set a time that's, like, that's contrary to what the statute says? Well, as to the wind-down period, Your Honor, the statutory language says that it expressly says that it's a, quote, option. Oh, sorry, are you talking about the 60-day termination itself or the wind-down? I'm talking about the 60-day termination. This is in B-3-B, where it says, you know, the termination shall not be effective earlier than 60 days after the date the notice is published. And so in the hypothetical, the Secretary publishes a notice but says this shall be effective in 30 days. I understand. I apologize for misunderstanding. I'm sorry, do you still have the same answer? Do you still think that's not reviewable? Yes, Your Honor, although I will acknowledge that that particular hypothetical involves a question not presented here. I still think that would be squarely within the language of the statutory bar. What it could possibly fall within is the kind exception, where some actions that are so clearly ultra-virus, courts will nonetheless look past the statutory bar, where something is clearly barred. So this came up in the Venezuela case. I think, for example, if a Secretary said, even though the statute limits you to 18 months, I'm going to grant TPS status for 100 years. That might be the sort of extreme ultra-virus action that might get you barred, even though you're clearly within its plain text. Nothing in the short is remotely presented here, but I think that theoretical safety valve does exist if there is something extraordinarily ultra-virus, like patently so. Why would you even, I mean, I take the point that you think this is different from the hypothetical, but speaking with the hypothetical, why do you even need this sort of extreme ultra-virus safety bar? Why is there even a determination in that hypothetical? I mean, it doesn't seem, it seems hard to characterize just an announcement that, you know, I'm going to do something that is contrary to the statute as she's not determining anything in that hypothetical, is she? I think potentially she is, Your Honor, in that she could have made the determination effective like 90 days or six months after. And so there is a determination on that effective date window. That one just wouldn't be statutorily compliant, but I do think that it does involve a determination of sort and thus falls within the language of the bar that Congress has enacted. How about immediately? Your Honor, I think that same analysis would apply, although that potentially would provide even stronger arguments that a kind like exception might apply there. So the government's position is the secretary could terminate, make it effective immediately, and proceed to remove the people? No, Your Honor, our position is not that the statute permits that, but our position is that that would be within the text of the jurisdictional bar that would not make, you know, unlawful conduct lawful, but it would make it unreviewable. I think, you know, jurisdiction aside, too, plaintiff's claims here fail on the merits as well. The district courts... That doesn't seem to be, that doesn't make sense because if something, you know, if you don't want something to be reviewed, that generally is something discretionary and all of that, but if it's flat out wrong with the statute and you're saying, well, okay, but then, so can the secretary do just anything and everything or whatever she wants? No, Your Honor, and, you know, as an initial matter, the kind exception is potentially available. I think I will acknowledge, too, that that is, you know, that would be a more problematic case where here what you have is APA review of the substance and procedures that attach under the APA. That's clearly within the core of what Congress was intending to preclude review of, but I think if you look at the language of itself, it does bar judicial review for any, you know, for anything with respect to a determination, and so, you know, I think these hypotheticals fall within the literal language of the statute. Yes, Your Honor. Is there any issue in this case that's not presented in the Venezuelan case? Your Honor, yes, although I think the claims are weaker. There was not specifically a preordained claim. I'm not looking for an assessment of weight. Yes. I want to know if there are any issues, jurisdictional merits or otherwise, present in this case that aren't present in the Venezuela case that's before a different Ninth Circuit panel. Yes, Your Honor, the preordained and wind-down period APA claims here were not presented in  We think they essentially raised the exact same review bar questions, but as to the merits of those claims, those are distinct APA claims that are not, that were not raised in the Venezuela case that are present here. I'll spare you my assessment for now of their relative strengths, but those APA claims are here and not in the Venezuela case. Well, but that case has priority over us. It's clearly going to have some effect, meaning, so why shouldn't we wait to find out what that case says before we, because they've got priority over us? Your Honor, if these were both merits appeals, I think that certainly would have some strong logic to it. This, however, is an emergency stay pending appeal that the government contends that we are suffering irreparable harm. And that is a view that the Supreme Court has endorsed in the NTPSA1 case. So it's the only thing we're ever going to do in this case is to stay? No, Your Honor, so as to announcing a precedential decision, you may want to wait for those the other panel to resolve it. But I don't think an emergency stay request can be put in abeyance while a different panel decides a different case. The government's contention is that we're suffering irreparable harm of the same sort of NTPSA1 and that our stay motion should be decided on a timetable that does not depend on how another appeal is decided. Well, okay. So what would be the effect of an administrative stay in this case, as opposed to a stay stay? Do you see a difference? As to alleviating the government's harms? No, Your Honor. I think that that would alleviate our harms during the duration that administrative stay was in place. So I'm still, I'm just not sure. So you agree that regarding a precedential decision on jurisdiction, which the other panel has priority and we should wait for that. But you want us, and we don't know how long that's going to take, because if it doesn't go the government's way, then I'm sure that there will be more going on there. So if it does go the government's way, let's say we did give you a stay right now. If it does go the government's, if it, if it doesn't go the government's way and we give you a stay and then it comes out, could the other side come back and say, well, we won, so you can't show irreparable harm? In some ways, Your Honor, I mean, I think it would always be available to the other side to bring a motion to reconsider based on intervening authority. That's something that could also always be made. But here we also have the additional factor of a stay from the Supreme Court deciding strikingly similar issues. And its decision in the Boyle case makes clear that its stay decisions are to control and control-like cases. So, so even setting aside the other panel of the Ninth Circuit here, the Supreme Court stay in the Venezuela case still exists, and the Boyle case still directs this court to, you know, use that to control-like circumstances, which we think this certainly presents here. If I may, I'd like to turn to the merits for a moment. You know, beginning with the preordained claim, I think that lacks support both legally and factually. Legally, the executive is permitted to have its policy preferences, and it need not abandon those when crafting policies under the APA. The district court's reliance on termination decisions that merely cite an executive order asking the secretary to review renewal and termination decisions carefully hardly establishes an APA violation. And the rest of the district court's analysis relies on second-guessing individual country factually, which violates both the APA and the jurisdictional bar here. As to the wind-down issue, the district court conjured a putative policy providing at least six months that did not actually exist. Prior decisions here are all over the map, as plaintiff's own chart showed, which is document 28 in the district court record, and there is no policy here that required an explanation of the deviation. Indeed, what the secretary did here was following the statutory default period of a 60-day wind-down period and explained in all three cases why that 60 days was appropriate. The APA required no more here. Could I ask you about the request in your motion for a stay of proceedings in the district court, pending a reassignment motion, which you have not yet filed? What would be the authority for us to enter an order staying district court proceedings? Your Honor, this court has inherent authority as part of its appellate jurisdiction to enter a stay of proceedings below. I think that makes a lot of sense here because the issues presented are overwhelmingly legal, and if we're correct on the jurisdictional bar, for example, there's nothing to remand or nothing left to do below. Does that sound in mandamus, or do you think it's ancillary? Because we have an appeal of a PI, that gives us authority to stay proceedings, not strictly a PI, but something you're asking us to treat as a PI. Because we have the PI appeal, that gives us authority to stay other proceedings in the case before the district court? Yes, Your Honor, I think that's within 1292A, and I know we cited two other statutory provisions in the stay motion that are escaping me at the moment, but I'm happy to pull those and provide those on rebuttal. But we do think it is part of this court's appellate jurisdiction. I mean, it's within the nature of it. I suppose it could also lean on the appellate of the All Writs Act if necessary, but certainly this court does issue stays of proceedings below at times. And that is not something that I'm aware of any precedent indicating the UAC authority to do just that. Just further considering on the wind-down issue, this issue is committed to agency discretion and unreviewable because it's expressly provided to be, quote, an option, end quote, for the secretary if she, quote, determines it to be appropriate, end quote. Acquaintances do not identify any law to apply to second guess what the secretary deems appropriate as an option. And in all events, even if this wind-down period claim were meritorious, it would at most justify relief regarding the wind-down period itself rather than invalidating the termination decision. Finally, the district court's equal protection holding should also be reversed. In analyzing alleged animus, it's worth recalling the nature of the decisions at issue here. Congress always intended temporary protected status to be temporary, hence the name. Here the secretary acted to cancel temporary protected status designations that had persisted for as long as a quarter of a century, rendering their intended temporary nature illusory at best. The district court thought such terminations were inexplicable except as animus, but making temporary status actually temporary is, in fact, nothing more than what Congress intended and hardly implies animus at all, let alone compelling a conclusion that animus is at play. The termination decisions here all supply the requisite rational basis, which is the applicable standard review under the Supreme Court's decisions in Hawaii, Matthews, Mandel, and Heracides. The district court refused to apply rational basis review here largely because in its view, there was no allegation of racial animus in the Supreme Court's Matthews decision. But that's simply wrong. The district court and Matthews have concluded that the challenge statute at issue was contaminated by invidious discrimination, and that's 426 U.S. at 73. So the entire premise for not applying rational basis review below here is simply erroneous. But even assuming the heightened Arlington Heights standard applied, the district court's analysis falls far short of satisfying that standard. In particular, it ignored the presumption of good faith entirely and only identified a single statement that was specific to any of the three countries at issue here. And that was a tweet about Honduras that was so unremarkable, the plaintiffs have not even pointed to it in their state opposition. Rather than pointing to anything specific about these three countries at issue, the district court instead relied on an amorphous, imputative animus towards all immigrants entirely. The regents makes clear that that's far too imprecise, and the district court further erred in relying on ancient campaign statements, which the Supreme Court's decision in Trump versus Hawaii makes clear is improper. This court should therefore follow the Supreme Court's lead in the Venezuela TPS case and grant a state pending appeal here. I certainly welcome any questions you have. Either of my panel members have any questions at this time? No. All right. So you've used all of your time. I'll make a decision after, depending on how long we spend with your friend on the other side, whether I'll allow a short rebuttal. Thank you, Your Honor. All right. We're ready for Mr. Arulova and Kam. Good afternoon, Your Honors. Ahilan Arulanandam from the UCLA Center for Immigration Law and Policy for Plaintiff National TPS Alliance and the individual plaintiffs. I'd like to start just briefly with appellate jurisdiction, not to belabor it, because I recognize that we briefed the same issue in NTPSA 1, but just to note that any stay, including even an administrative stay, would involve an exercise of appellate jurisdiction. And I don't see how the government can get around the problem that there are these two cases which say there's no appellate jurisdiction in orders like this one, which don't have the practical effect of an injunction under Montana Wildlife Federation, and also this case, Alsea Valley, which it cites. So I won't get into it if the court doesn't want to get into it, except to note, you know, I do think that that question would have to be resolved before any stay of any kind were issued in this case or in NTPSA 1. So how do you distinguish the case from last month in Immigration Defenders Law Center? So I'm not sure that it can be distinguished and it doesn't cite these other cases. And that's why we cited, you know, the rule, obviously, that a later panel can't overrule an earlier one, because I think if it can't be distinguished, then you have to follow Montana and Alsea Valley. I do think it's different because the order there stopped the re-implementation of MPP. You know, what they said they were staying was not just an administrative action, like a termination order or some kind of order, but it said also the re-implementation of MPP. Now, it didn't call it an injunction. It said it was postponing that, but it was actually underlying conduct. And the plaintiffs thought that. We cite the district court order and also the plaintiff's request as described in the district court order. So I do think it's arguably more injunctive. It's more like asking someone to do something, although it's not directed at a party. So it's not exactly the same as a traditional injunction, but I think it's closer than what we have here, right? All we have here is an order that says this decision is postponed until November 19th. Suppose, I mean, suppose the secretary, you know, were to ignore the district court's order if we don't stay it. And then the secretary just ignores it. And, you know, I guess, you know, initiates removal proceedings or try to, you know, arrest, tries to remove people whose status has expired under her order. But that would have been stayed by the district court. You wouldn't go to the district court and complain about that? We certainly would. But two thoughts around that. First, that would not itself be contemptible. We'd need another order directing a person before it would become contemptible. And that distinction mattered to the Supreme Court in Kent. Because in Kent, right, they're talking about a stay of removal, which is almost it's exactly your hypothetical, I think, or very close to your hypothetical. Yet, nonetheless, they said that was not an injunction for purposes of 8 U.S.C. 1252-F2 because it was not enforceable by contempt. And then the second thing I'd say, Your Honor, on that is Montana Wildlife, and I'll quote, it says, if the only action required of the government is that the agency refrain from enforcing the challenged action, that is not enough to render it an appealable injunction. And I'll say a valley has a very similar line in it. It says, of course, as a practical matter, the agency is prohibited as a practical matter from the enforcement of this listing of the salmon. But that, again, that was not enough to render it appealable. So I think just the fact that they have to acknowledge the district court order exists and that they can't enforce the thing that it postponed is not enough under these court's cases. If they're not further on that, I'll turn to the question about emergency. It was Judge Callahan's first question. I do think it's highly relevant here. The only thing that the stay would accomplish between now and September 8th, September 8th is the date when Honduras and Nicaragua would expire, is that 7,000 Nepalese who have lived here for more than a decade would be subject, they would lose their employment authorization and be subject to detention and deportation. And while that's enormously significant to them, it is not, I think, by any stretch, irreparable harm to the government and certainly not comparable, Judge Hawkins, to your question about NTPSA-1. NTPSA-1, we were counsel in that. We are counsel in that case, obviously. But the stakes were higher, obviously. There's 350,000 Venezuelans who were at stake in NTPSA-1. They were recent, in general, people who had come here since 2021. So it's a more recent population. There are other differences, too. This order expires November 19th, as I've said a couple of times. That order just was pending the conclusion of the district court proceedings. The equities were different. The government said in that case that the Tren de Aragua and the security concerns created by Tren de Aragua were implicated. We disputed that. We hotly disputed that, making arguments like we make here that even somebody with two misdemeanors is ineligible for TPS. But that might have been what the Supreme Court decided. We don't know because they didn't write anything. So there's that difference. There's 40,000 American children who live with all the TPS holder population in this case, which is different from what was going on there. This population as a whole is much more like the population in the Regents case, the DACA case, because we're talking about people, most of whom have lived here for 25 years lawfully. It's also Judge Callahan, like the population in the Ramos case. It's actually some of the same countries at issue in these cases. But it is not in that way. Also, it is different from the population in Venezuela. So those are some of the differences. I'll give you a couple of more. The APA claims, as Mr. Anson has acknowledged, are completely different. That claim was about vacature authority. It's a totally different kind of claim. This is a challenge to terminations. And also the merits challenges are totally different. The thing we had in the Supreme Court had nothing to do with these at all. I think there are a number of reasons why it might be different. And while some of these differences may have mattered and some not, there's no way to know because it's not precedent. There's nothing. You can't point to any reasoning like you could in Wilcox, for example, and Boyle, where you can say, oh, they have said this is the kind of person who can be fired by the president or not. There's nothing like that here. The last thing I'll say about NTPSA 1, Your Honors, the second paragraph of NTPSA 1, even though there's no reasoning in it, but it says do this and do this. The second paragraph says that the claim that stays without prejudice to preserving the rights of some set of Venezuelan TPS holders. And then we went back in the district court and actually won relief for that smaller population of people. That suggests they think some claims are justiciable under the TPS statute. So if we're going to play this game of trying to read the tea leaves as this opinion that has no reasoning in it, which I don't favor, I don't believe that's appropriate. But if you're going to do that, it suggests that their jurisdictional, the government's jurisdictional arguments are too broad. And so I'll turn to that now unless there's other questions about the emergency issues here. Yeah, I just say the record is full of this. There's American citizens who are going to either be separated from their families or they're going to be sent to places where the medical care is inadequate, you know, because they're there. I mean, yes, this is overwhelming. Johnny Silva is one of our very, very sympathetic individuals, particularly the people that you've selected, because they're not they don't fall in the criminal realm. They're people. But I guess the question that I struggle with always is when you get this status, it doesn't give you an automatic path to citizenship and it's temporary by its very nature. And so what it seems to me, the sympathy part of it is asking us to do something that to change their status, which we obviously don't have authority to do so. Yes, I remember. Yes, Your Honor, and I remember our exchanges about this from a few years ago. I would just say this is not the appeal. It's not the argument that we had last time. This is the stay. We're only making this point for purposes of equities. They have to show irreparable harm. And what they're saying is the government is irreparably harmed because it can't deport these 7000 people or later these, you know, 50, 50, whatever it is, 50,000 remaining people. And to show that, shouldn't they have to show something bad about, you know, beyond just the naked policy preference itself? You know, and I don't think that they don't cite any authority, which is just the naked authority itself is good enough. If it were Biden v. Texas, you know, the Supreme Court should have granted a stay there. U.S. v. Texas, they should have granted a stay there. The recent birthright case that this court just issued. I mean, all of these show that they just the pure policy preference is not enough. And there's not a record here to show that there's any other harm besides that. Turning to the merit. Except that they can't do their job. If TPS is strictly a within the executive branch or for them to determine not being able to do your job because no one else can determine that you can't, you know, you or I can't go and say, hey, you should give this country TPS. You should do that. We can't they can't do their job if if we don't give them a stay. That's their argument. That's the irreparable harm in my mind. Right. And I guess I just feel like that pure just the look, we think it's right. And therefore, we're irreparably harmed because we don't get to do what we think is right. That at that breadth of argument, which is I do think is the argument they're making, they should be able to get a stay in any case. Well, that might be really broad. But then you're saying create a right that we know we don't have in the statute, that somehow that you have a right to convert TPS to some sort of permanent path. Right. So, yeah. So let me turn then to the jurisdictional arguments, because it is true that, you know, we have a difference about whether or not there is anything cognizable here. You know, I'd say, you know, the consent maybe it's not a concession, but the the problems created by Judge Miller's question about, you know, you can these hypotheticals about them granting TPS for 100 years or, you know, terminating before the statutory period provides it. And that's a bigger problem for them than they acknowledge, because there is no account of the word determination on their construction of it that actually permits judicial review under these situations. If determination means any action or decision and with respect to means relating to TPS, then it's clearly covered by the hypothetical that Judge Miller and Judge Hawkins have suggested. You know, so instead, I think it suggests that you have to look for a different meaning of the word determination. And we find that meaning in the ways the statute uses the word determine. And it uses it, you know, a bunch of times in subsection B. And it is only stripping claims over subsection B. And then the other thing I would say is, you know, if he wants to acknowledge, he does that there may be an ultra vires, lead him be kind kind of exception here. You know, our claim that we have pled is that the secretary has decided to end TPS for all of the countries because, you know, President Trump said, I want to revoke TPS, you know, because it's illegal. That's what he said on the campaign trail. And that the invasion executive order when it says you have to align TPS with the objectives of stopping the invasion, you know, what that means is end them all. Now, we might be wrong on the merits. That's a separate question. And we have, you know, deferential, this court should apply deferential factual review to that. But that is surely a claim that it's as ultra vires as, you know, some of these other hypotheticals. I think we ought to be able to have jurisdiction over that claim. The second thing I'd say is our orderly transition claim, which is that this is a radical departure from the agency's past practice. And it is unexplained and unacknowledged, right? That's our claim about that. That goes to subsection D of the statute, D as in dog, not B as in boy, because that's where the orderly transition is mentioned in subsection D. But the stripping provision only applies to determinations under subsection B, under this subsection, which is subsection B. And so we have a clean argument that this claim is not subject to the bar. And they're now making new arguments, which they never even made in the district court motion litigation, saying it's barred by 701A2 and saying it's barred by 1252A2B2. You know, and I can answer those. I've done some amount of reading, you know, in the last few days to try and understand that. But I would suggest that rather than deciding new jurisdictional arguments that were not presented to the district court, you know, under these statutes, the court should either deny the stay and say, look, you know, they never made this argument. And so, you know, they don't get to, not that it's waived, it's a subject matter argument, I get that, but that the district court did not have an opportunity to do this. You should make that argument first in the decision below, or at least let us brief it, at least let us brief it, because I don't think it's fair to sort of late in the stage like this, make these kinds of arguments. So going back to your first, that was sort of pre-decided, which is basically an APA claim. Absolutely. So I'm not totally sure I follow how you read, how you construe the word determination, that it doesn't cover an APA challenge to the decision about whether or not to terminate for a particular country. I read determination to mean that the challenge to the country conditions assessment itself is barred. And what I mean by that is like the kinds of claims you get all the time in asylum cases that you all probably have seen thousands and thousands of times. If we wanted to say you are wrong, there's no substantial evidence to support the claim that Nicaragua is safe, you know, given that your own USCIS memo says it's not safe, or same with Honduras, that claim is barred. However, a claim that goes to the... Oh, dear. We had some phrasing here. Do we have Kwame standing by? Yeah, I'm here. I'm going to mute the stream. Good faith objective review process, which is required by the statute. Can you stop for just one second? We're unfreezing you. Would not be barred. Can you hear me now, Your Honor? Well, now you're, yes, we could hear you, but we couldn't, you weren't moving. But now I think your lips and your face are doing the same thing. So are we okay, Kwame? Yes, audio is back for the stream. Okay, thank you. I apologize for that, Your Honor. Oh, you didn't do it. The forces did it. Someone else. Well, so, but let me ask you this about the predetermined. Why isn't the argument that the secretary predetermined to terminate the TPS is foreclosed by the Supreme Court's opinion in Trump v. Hawaii? Well, Trump v. Hawaii only addresses the anti-discrimination claim with respect to that. I don't recall that they haven't argued that there's any aspect of Trump v. Hawaii that forecloses the APA claim on predetermination. Whether or not that claim is available depends entirely on what you think determination means. And as I said, I think it's meant to bar country conditions, challenges like what you see in asylum cases. But process, where we say if you're not conducting the review that is required, the statute says, shall review the country conditions. And it's part of the periodic review process. And that's what we're saying. The APA imposes on that a rationality and good faith. Just humor me a little bit here and tell me specifically in what ways do you contend that the secretary failed to follow the APA procedures in terminating TPS? Sure, Your Honor. More specifically. We're kind of talking globally, but just more specifically. Sure, Your Honor. First, we think review entails actual consideration of the country conditions that are at issue in the case in a given country. So, for example, here you have in May of 2025 USCIS writing a memo as to Nicaragua saying it is not safe because there's massive political instability and humanitarian crisis. It says Honduras is not safe. Same memo or different memo. But, you know, May of 2025 USCIS country conditions memo on Honduras says it's not safe because there's rampant crime. This is something which is all over. The State Department says the same thing. Now, it's one thing to say like, you know, I've looked at that and I actually think it's not that bad. But that's not what's happening here. Instead, it is entirely ignored. There's no reference to it at all. And it's not just eight countries. It's seven countries in a row that they have done this, even when there's massive problems. I'm sorry to interrupt there, but a garden variety arbitrary and capricious challenge under the APA says exactly that. Like there was this important piece of evidence or this argument that we made and you didn't address it. So, do you think that that sort of challenge escaped the bar? No, Your Honor. I was just saying that to say it's evidence. Judge Callahan asked me, or I understood the question to ask me, what is the evidence for this? And part of the evidence is the fact that they are repeatedly, seven times in a row, ignoring the worst country conditions. Another one, though, equally important, Your Honor, equally important, is the fact that they have said they are going to do this. They're going to revoke TPS because they think it's illegal. And we cite, the district court cited statements, statements from the president saying they're going to revoke TPS, a statement from the invasion executive order that TPS has to be aligned with the priorities of the administration. And that, in turn, is cited in each of these decisions. So, it's not just that, if it was just an arbitrary and capricious claim, that wouldn't be enough, actually, for us to win on this claim. We have to show more than just arbitrary and capricious. We have to show that they actually have the intent to end TPS without looking at what the result of the country conditions assessment is going to be. So, just, like, disagreeing or even making a mistake is not enough. We actually have to show that their plan is to end TPS. And that's different from an arbitrary and capricious claim. But we have made that showing for purposes of preliminary relief, for sure. We have made that showing because they have statement upon statement. And that factual finding is reviewable for clear error on appeal. And how is that different? I mean, every change in administration, I mean, just to take it out of this context and another administrative law setting, the EPA administrator comes in, and it's somebody who, before he came in, he said, you know, we need to cut all this red tape that's holding back American business, or, you know, we need to clean things up and stop the polluters. And it seems like on your logic, you know, when he then sets air quality standard, you'd be able to say, well, this was just part of your pre-existing either regulatory or deregulatory agenda. So, which is not how the EPA works, right? Right. Yeah. So, yeah. So, two thoughts. You know, first, you know, the orderly transition claim is entirely distinct from this, right? And that it just rests on the 22 years of past practice until this administration. Just want to make sure, I'll answer your question, but I just want to make sure, totally, that is a distinct claim. They have to win on that claim also to win the stay here. If we are right, and people are entitled to at least six months, then it follows that the stay here is authorized because it only runs through November 19th. So, I just want to say that that is a distinct basis to reject the government's claim for a stay with a distinct jurisdictional basis as well. But to answer your question, I would look to, even at the same time, the Department of Commerce, the census case, you know, says, of course, you can have a change in administrations. It also says agencies have to offer genuine justifications for important decisions. And so, I think the extent to which you can have a deviation in agenda, it's determined by the statutory framework. And so, if the statutory framework gives a huge amount of latitude, well, then, you know, there's more space, in a sense, for what you are talking about. Here, the statute, and this is something that we litigated in Ramos as well, the statute requires the TPS be extended unless the secretary determines that country conditions no longer warrant designation after reviewing the country conditions. And so, we do think this statute imposes a certain kind of objectivity constraint on the agency. That was what it was intended to do. It replaced a vastly discretionary regime that was found insufficient in 1990 by Congress. It was meant to bar the kind of individual country conditions litigation you get in asylum cases, for sure, absolutely. But it was not meant to give them carte blanche to do sort of whatever they want. And so, that constrains the extent to which the APA's, you know, constraints, you know, operate on the decision making. I see my time has expired. I know I haven't addressed the district court, this forthcoming recusal motion, or the discrimination claim. I don't know if the, I don't know if the court. Do you, if either of my colleagues would like to give you that time, I'll just give the other time on rebuttal. I'm already going to give him a couple of minutes, because we've taken you a couple of minutes over. Do you want, would you like him to explore that in two or three minutes? No. Okay. I don't have any questions on those subjects. Okay, it appears we don't have any questions. So, why don't you take 30 seconds to a minute to wrap up? You know, I'll just say again, this is an emergency motion. So, the threshold question under this court's law is still this court's law at East Bay. They have to show that there's an emergency between now and either when the appeal gets litigated or November 19th. And I really think this case really rises and falls entirely, you know, on the equities. You may disagree with us about jurisdiction. We know it was a hotly contested issue last time around, but it's not the sort of thing that should be resolved at this stage, particularly when they're conceding that they can't keep the hard line that they have to keep. They need to draw some other distinction, because they recognize that these extreme statutory examples don't work. And rather than drawing that line in here, I would respectfully request the court should just wait and do this when the appeal comes. Thank you, Your Honors. All right, thank you. I'll give the government three minutes for a rebuttal. You don't have to take it, but if you want it, you can have it. Thank you, Your Honors. Four quick points. I'll try to be under time. First is to appellate jurisdiction. I think this court's decision in def is absolutely controlling here. That recognizes there's appellate jurisdiction over 705-stay. I will tell you also that 705-stays are distinct from the Ken-stays and that parties routinely threaten us with contempt for violating a 705-stay. So I don't think there's any distinctions. You think you would be, I mean, parties may threaten you with that, but is the position of the United States that you would be subject to contempt if you violate it? Your Honor, I think there are additional complexities there, but I certainly, the position of the United States is that we comply with court orders and do not intend to, you know, produce a circumstance where that would even be resolved. But certainly, court orders cannot be violated, you know, and there are consequences that attach to that. And those sort of serious consequences, whether they're contempt or something else, and I believe most opposing counsel recognize that it certainly can lead to contempt. I think it just requires one extra step in his mind. It's more than sufficient to establish appellate jurisdiction, as is the fact that the Supreme Court granted a stay in NTPSA 1, where jurisdiction wasn't even raised as a concern. And the Supreme Court has granted stays in many other instances where Section 705 stays were an issue, again, without any jurisdictional concerns. And that is not a court that is insensitive to jurisdictional concerns. So we think there's certainly appellate jurisdiction here. Similarly, we think the NTPSA 1 resolves both the irreparable harm and the equities questions here. They really are just the same, the flip side of the coin here. They present the exact same issues when, you know, I don't think there's a meaningful distinction between tens of thousands and hundreds of thousands of individuals at issue. It is still a source of irreparable harm to the government. Third, preordained is an APA claim. It is not an ultravirus claim. I don't think it could squeeze within any of the exceptions that we've talked about. And very tellingly, the preordained claim relies, even in opposing counsel's telling, on second guessing the country conditions. And that is squarely what is within the jurisdictional bar. So I think that this is absolutely within the core of the jurisdictional bar. And this court, you know, should follow Congress's explicit, you know, prohibition on exercising judicial review of these circumstances. And with that, if you have any questions. All right. Any questions for my colleagues? All right. If that would appear that that would conclude argument. And I guess I'm just trying to think. I'm thinking out loud right now. So we've had an argument. Are we submitting anything right now? We really aren't, right? I think that's to be determined. That we'll discuss it.  Yes.  It's in further order of the court. Is that what we would say? Are you? So we're going to discuss this and we will look further order. The court will say we're for submitting whatever we're doing. As after we talk about this, this is all been going quickly. Thank you, Your Honor. All right. Thank you both for your arguments today.
judges: HAWKINS, CALLAHAN, MILLER